**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No.  06-174 (JDB)** |
| **v.** | : | |
| | : | |
| **WENDELL HARRIS RORIE,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this omnibus opposition to defendant's Motion to Suppress Tangible Evidence and Motion to Suppress Statements.  In support of this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing regarding these motions.

**I.      Factual Background**

The defendant is charged in a one-count indictment with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. §922(g)(1).   At a hearing or trial in this matter, government counsel expects the evidence for this charge to demonstrate substantially as follows:  On May 8, 2006, at approximately 11:55 p.m., two officers of the Metropolitan Police Department (MPD) responded to a report of gunshots near the 700-800 block of Yuma Street, S.E.  While canvassing the area, the officers entered a parking lot located between the 800 block of Barnaby Street, S.E., and the 800 block of Yuma Street, S.E., an area where the officers were aware of prior drug and gun activity.  In the parking lot, the officers observed a parked two-door

black Cadillac occupied with the defendant sitting in the driver's seat and another individual in the front passenger's seat.  The Cadillac's engine was parked with its rear facing the rear of the parking space, and its front facing out into the parking lot.   Without blocking-in the Cadillac, the officers stopped their marked squad car and approached the vehicle on foot with the intention of interviewing the occupants of the vehicle about the gunshots.  One of the officers approached the partially opened driver's side window and attempted to talk with the defendant about the report of gunshots.  Other than indicating that he too had heard gunshots, the defendant refused to answer the officer's questions.  The defendant accused the officer of harassment, refused the officer's request to step out of the car, and refused to produce identification.  He rolled up the window and locked the car doors.   The defendant then indicated that he was going to call his mother, who was the owner of the car, on his cell phone.   The officers waited for less than a minute for the arrival of the defendant's mother who, it was later determined, lived in one of the apartment buildings in front of the parking lot.  As the defendant's mother approached the Cadillac, the defendant quickly exited the car through the driver's side door and attempted to flee towards a wooded area behind the parking lot.  In so doing, he left the driver's side door wide open.   The defendant was quickly stopped by one of the officers by the car, but not handcuffed at this time.

The passenger who was seated in the front passenger seat also exited the vehicle.  He did not attempt to flee and was not stopped or physically touched by the officers.

 Once the defendant had been stopped, an officer observed in plain view through the open driver's door of the vehicle the handle of pistol protruding out from under the driver's seat where the defendant had been sitting.   When the officer stated aloud that a gun was in the car, the

defendant broke free from the officer holding him and attempted to flee again on foot.  The defendant was stopped again and placed in handcuffs.

An MPD Crime Scene Officer removed the gun from the car.  Upon inspection, it was determined to be a Rock Island Armory .45 caliber pistol loaded with one round of live .45 caliber ammunition in the chamber and nine rounds of live .45 caliber ammunition in the magazine.   The gun was dusted for prints.  Found on the left side of the gun's magazine was a latent fingerprint which was analyzed and found to match the defendant's right thumb.

In his Motion to Suppress Tangible Evidence and Motion to Suppress Statements the defendant asserts that his arrest was without probable cause or reasonable suspicion and therefore the evidence must be suppressed.  The defendant further asserts that his statements to the officers at the scene when they first approached the Cadillac were made in violation of <u>Miranda</u> and were otherwise obtained involuntarily.

## II.     <u>The Officers Had Probable Cause to Arrest the Defendant and Recover the Gun</u>

### A.     <u>There was no Fourth Amendment seizure when the officers approached the vehicle</u>

It is well established that police may make contact with citizens and investigate criminal activity without triggering the protections of the Fourth Amendment.  <u>United States v. Mendenhall</u>, 446 U.S. 544, 552 (1980).   "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."  <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983) (plurality opinion) (citations

omitted).  Only when police officers have restrained the liberty of an individual, by means of physical force or show of authority, is there a "seizure" within the meaning of the Fourth Amendment.  <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n. 16 (1968).  Thus, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest."  <u>Terry</u>, 392 U.S. at 22.

The "crucial test" for determining whether police conduct crosses the threshold from a consensual police-citizen encounter to a seizure or forcible stop is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' "  <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991)(quoting <u>Michigan v. Chesternut</u>, 486 U.S. 567, 569(1988)).  A court's analysis should "take[ ] into account all the objective circumstances of the encounter . . . ."  <u>United States v. Lewis</u>, 921 F.2d 1294, 1297 (D.C. Cir.1990).  Relevant factors in this analysis of whether the encounter was consensual include "the time of day, the place, the officer's tone of voice, and whether the officer displayed a weapon or handcuffs, wore a uniform, touched the individual without permission, threatened or physically intimidated him, or retained his identification[,]" <u>id.</u>, what if any commands officers gave to the individual during the encounter, the number of officers involved in the encounter, and whether the officers blocked the individual's path of exit.  <u>See</u>, <u>e.g.</u>, <u>United States v. Drayton</u>, 536 U.S. 194, 195 (2002) (considering facts that there were no threats or commands given, nor were exits blocked, during the encounter); <u>United States v. Wood</u>, 981 F.2d 536, 543 (D.C. Cir.

4

1992)(noting that during encounter, officers were positioned such that defendant's movement was restricted in apartment entranceway, and that officer told defendant to stop).

The evidence will show that the encounter between the defendant and the police here was not a seizure prior to the defendant being prevented from fleeing from the scene.   First, the encounter occurred in a public place, not inside the defendant's residence.  Further, only two police officers were involved in the contact.   Moreover, at no time was the path of the Cadillac block by the police cruiser.   Indeed, the Cadillac, which was running as the officers approached it, was facing out into the parking lot and could have easily exited the parking space and left the lot.  The officers also did not rush up to the vehicle.   Rather they approached the Cadillac at a non-confrontational pace, seeking any information about gunshots fired in the area.    Nor did the officers ever block the defendant's (or the passenger's) means of egress from the car once they had approached the vehicle.  Nor were the officers guns ever drawn.  Nor were handcuffs brandished until after the defendant was stopped as he attempted to flee from the police the second time.   Further, the officers had no physical contact with the defendant prior to his flight, and  never threatened him.  They also never retained, or even received, his identification.  Nor did the officers ever order the defendant to "stop," "freeze," "stay where you are," or "put your hands up" prior to him bailing out of the Cadillac.  Indeed, the officers never commanded the defendant do anything.   Rather, the evidence will show that a single officer spoke with the defendant in a moderate tone of voice asking him if he would step out of the car to answer some questions concerning the sounds of gunshots in the area.  When the defendant refused, he was permitted to do so.  Accordingly, for all these reasons, the defendant cannot be said to have been seized for Fourth Amendment purposes  when he was contacted by two officers on May 8, 2006.

Only after the defendant attempted to flee from the officers by bailing out of the vehicle was he detained by the police.

### B.    The police's seizure of the defendant as he fled from the scene was justified by reasonable suspicion

A warrantless seizure may be justified if it is the result of a lawful investigative stop under <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).   A law enforcement "officer may briefly detain a citizen if he has a reasonable, articulable suspicion that 'criminal activity may be afoot.' " <u>United States v. Edmonds</u>, 240 F.3d 55, 59 (D.C. Cir.2001) (quoting <u>Terry</u>, 392 U.S. at 30).   The <u>Terry</u> stop "requires only a 'minimal level of objective justification.' " <u>Edmonds</u>, 240 F.3d at 59 (quoting <u>INS v. Delgado</u>, 466 U.S. 210, 217 (1984)).   "Reasonable suspicion is not a finely-tuned standard;  instead it is a fluid concept that derives substantive content from the particular context in which it is being assessed.   The standard is dependent on both the content of information possessed by police and its degree of reliability and requires a showing considerably less than preponderance of the evidence." <u>United States v. Holmes</u>, 360 F.3d 1339, 1341-42 (D.C. Cir.2004), <u>vacated and remanded on other grounds</u>, 543 U.S. 1098 (2005)(internal quotation marks and citations omitted).   "To support an investigative stop, it is sufficient that the facts present and the rational inferences to which these facts give rise, reasonably warrant the intrusion . .  .." <u>United States v. Savage</u>, 889 F.2d 1113, 1118 (D.C. Cir.1989) (citing <u>Terry</u>, 392 U.S. at 21).   To determine whether the facts warrant the intrusion, a court must look to the totality of the circumstances.   <u>See</u> <u>id</u>.

In <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124-25 (2000), the Supreme Court held that a suspect's unprovoked flight from a police officer in an area of "expected criminal activity" gave

6

the police articulable suspicion justifying a Terry stop.    As the Supreme Court reasoned,

"nervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and

"[h]eadlong flight  . . . is the consummate act of evasion  . . . ." Id. at 124-25; see also California

v. Hodari D., 499 U.S. 621, 624 n. 1 (1991) ("That it would be unreasonable to stop, for brief

inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident,

and arguably contradicts proverbial common sense."); United States v. Williams, 816 F. Supp. 1,

10 (D.D.C.1993)(considering in Terry analysis "the fact that defendant, who was talking to

someone, immediately turned around and walked away when [the officer] approached him").   In

this case, the defendant's flight from the police, coupled with the fact that the incident took place

in a neighborhood where the officers were aware that there had been several prior incidents of

drug and gun crimes, alone justify the defendant's brief detention when he fled from officers.

See Wardlow, 528 U.S. at 124-25.  Indeed, the officers were responding to a report of gunshots

just minutes before in the area of the parking lot, a fact that, which when combined with the

"lateness of the hour" enhanced the probability that criminal activity was afoot.  Cf. United

States v. Brown, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (finding that another relevant factor in the

Terry analysis was that the officers were responding late in the evening to a report of gunshots

being fired from parking lot); see also United States v. Raino, 980 F.2d 1148, 1150 (8th

Cir.1992) (holding that a Terry stop was supported by the fact that "the officers were responding

to a late-night call that shots had been fired in precisely the area appellant's car was parked").

Based on all these factors, the officer's prevention of the defendant's attempted flight from the scene was fully consistent with the Fourth Amendment.[1]

### C.    When the gun was observed in plain view under the seat where the defendant had been seated, his warrantless arrest was justified under the Fourth Amendment

The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. See Minnesota v. Dickerson, 508 U.S. 366, 374-75 (1993). In the instant case, the officer observed the gun protruding out from underneath the driver's seat while he was standing outside the driver's side door left open by the defendant when he fled from the car. Once the officer saw in plain view what he clearly knew was a gun, he could lawfully seize it. See id.

Thereafter, it is axiomatic that the defendant could be arrested without the officers first obtaining an arrest warrant because the officers had probable cause to believe that he had committed a criminal offense, namely, possession of the handgun observed underneath the

---

[1] Such a holding would also be entirely consistent with the legal principle that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. See Florida v. Royer, 460 U.S. 491, 498 (1983). While any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," Florida v. Bostick, 501 U.S. 429, 437 (1991), as the Supreme Court explain in Wardlow:

> unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

Wardlow, 528 U.S. at 125.

defendant's seat.  See Florida v. White, 526 U.S. 559, 565 (1999).  Probable cause must be evaluated in terms of the totality of the circumstances, as viewed by a reasonable and prudent police officer in light of his or her training and experience, that would lead the officer to believe that a criminal offense had been or is being committed.  See United States v. Green, 670 F.2d 1148, 1151 (D.C. Cir. 1981); Brinegar v. United States, 338 U.S. 160, 175 (1949).  Given the proximity of the defendant to gun which was in plain view, the officers had probable cause to place the defendant under arrest for possession of that handgun.

**III.    Defendant's Statements are Admissible Against Him.**

As stated above, the defendant's arrest was lawful.  Accordingly, there is no basis to suppress his statements as the fruit of an illegal arrest.  The defendant argues that any statements made by him were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), or otherwise made involuntarily in violation of  Lego v. Twomey, 404 U.S. 477, 489 (1972).  Under Miranda, custodial interrogation automatically triggers numerous procedural safeguards to protect an individual's Fifth Amendment right against compulsory self-incrimination.  As explained in Miranda, custodial interrogation refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  384 U.S. at 444.  The Court has stressed that these safeguards come into play only when the defendant is subject to both custody and interrogation.  Rhode Island v. Innis, 446 U.S. 291, 297 (1980); Beckwith v. United States, 425 U.S. 341, 347 (1975).  Thus, in the absence of either factor, Miranda safeguards do not apply.  See id.

At the time the defendant made his statements to the police, he was neither in police custody nor subjected to interrogation by the police.  A suspect is not in custody for Miranda

purposes unless the police have imposed upon the subject "restraints comparable to those associated with a formal arrest." Berkemer v. McCarty, 468 U.S. 420, 435-442 (1984). Thus, the police need not give Miranda warnings during a consensual contact on the street or even during a Terry stop. Id.; United States v. Gale, 952 F.2d 1412, 1415-16 n.4 (1992). As demonstrated above, prior to the recovery of the gun, the defendant was never under arrest or restrained in a way comparable to a formal arrest. Thus, the Miranda prescriptions have no application here.

Similarly, there was no police interrogation in this case. The Supreme Court has defined "interrogation" as including "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the subject." Rhode Island v. Innis, 446 U.S. at 301. Questioning by law enforcement officers as they arrive at the scene of a possible crime attempting to determine the nature of the situation, as happened here, does not fall into that rubric. See United States v. Wiggins, 509 F.2d 454, 459 (D.C. Cir. 1975) (Miranda decision does not curtail "(g)eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process"). For this independent reason, there was no violation of Miranda in this case.

Finally, the statements made by the defendant cannot be said to have been involuntarily given. A statement is voluntary for purpose of due process so long as the statement is "the product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (citing Columbe v. Connecticut, 367 U.S. 568, 602 (1961)). Moreover, for a statement to be involuntary, it must have been caused by government overreaching. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986) ("[a]bsent police conduct

casually related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law").  There is no indication of such conduct in this case.  Moreover, even if there were, there is no indication in this case that under the totality of the circumstances, Lego v. Twomey, 404 U.S. at 489 (government has burden of establishing under preponderance of the circumstances that the confession was voluntary), defendant's will was overborne.  See Rogers v. Richmond, 365 U.S. 534, 544 (1961) (government conduct must be "such as to overbear [a suspect's] will to resist and bring about confessions not freely self-determined").

As in determining whether a seizure has occurred, in order to determine whether a statement was voluntarily made, the court must examine the totality of circumstances to determine whether an individual's "will has been overborne and his capacity for self-determination critically impaired."  Schneckloth v. Bustamonte, 412 U.S. at 225; Harris v. Dugger, 874 F.2d 756, 759-62 (11th Cir.) (confession voluntary even though defendant in forearm cast and handcuffed during six-hour interrogation), cert. denied, 110 S. Ct. 573 (1989); United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will); United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988) (defendant's seasickness, his uncomfortably hot room, and his unfamiliarity with American legal culture not a legally adequate basis for concluding that confession was involuntary); United States v. Pelton, 835 F.2d 1067, 1072-73 (4th Cir. 1987) (FBI agent's assertion that would launch full-scale investigation if defendant did not cooperate not sufficient to render statements involuntary), cert. denied, 486 U.S. 1010 (1988).  For the

11

same reasons the defendant was not seized prior to his flight from the police in this case, his

statements made to the officers prior to his flight from the car were not involuntary.

WHEREFORE, the government respectfully requests that the Court deny defendant's

motions.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY
BAR NO.  451058

_____

G. MICHAEL HARVEY
ASSISTANT UNITED STATES ATTORNEY
D.C. BAR NO. 447-465
FEDERAL MAJOR CRIMES SECTION
(202) 305-2195

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Government's Memorandum In
Opposition to Defendant's Motion to Suppress Tangible Evidence and Motion to Suppress
Statements is to be served upon counsel for the defendant, Dani Jahn, Esquire, this _____th day of
August, 2006.

_____

G. MICHAEL HARVEY
ASSISTANT UNITED STATES ATTORNEY

12